Elizabeth V. BOGOSIAN,
Plaintiff, Appellant,

v.

MERCEDES–BENZ OF NORTH AMER-
ICA, INC. and Daimler–Benz North
America Corporation, Defendants, Ap-
pellees.

No. 96–1287.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1996.

Decided Jan. 8, 1997.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

After being struck and injured by a rolling automobile, plaintiff-appellant Elizabeth V. Bogosian commenced this diversity action in Rhode Island District Court alleging strict product liability, negligence and breach of warranty against Mercedes–Benz of North America, Inc. ("Mercedes–Benz") and Daimler–Benz North America Corporation.[1] The jury returned a verdict in favor of Mercedes–Benz on the strict liability claim, the only liability theory it considered.[2] Bogosian appeals, contending that the district court committed reversible error in (1) granting judgment as a matter of law in favor of Mercedes–Benz on the negligence claim, (2) excluding one of her expert witnesses, (3) excluding evidence of a product modification occurring after the manufacture of the automobile in question, but before the injurious event, and (4) denying her motion for new trial.

## I.

### Facts and Prior Proceedings

The facts are largely undisputed. On July 9, 1992, Bogosian drove her daughter's 1986 Mercedes Benz 560 SEL automobile ("560 SEL") to her home and pulled into the parking area adjacent to the driveway. The pavement on which she parked sloped slightly toward the rear of the car. According to her testimony, Bogosian placed the transmission gear selector lever, located on the console shift between the front driver and passenger seats, in the park position. She did not set the parking brake. She then removed the ignition key, locked the car doors, and walked toward her house. Upon ap-

Bruce Todesco with whom John F. DiMeglio Providence, RI, and Legal Research & Writing, Inc., North Providence, RI, were on brief, for plaintiff, appellant.

Gerald C. DeMaria with whom John F. Kelleher and Higgins, Cavanagh & Cooney, Providence, RI, were on brief, for defendants, appellees.

1. There is no indication in the record that Daimler–Benz of North America Corporation had any pertinent involvement (by way of design, manufacture, distributorship, sales, or otherwise) with the vehicle that injured Bogosian. At oral argument before this court, counsel for Bogosian was unable to clarify the status of this party-defendant, while counsel for Mercedes–Benz explained that the entity was a holding company, and confirmed that it had no relevant connection to the action. In the absence of any contrary assertion, we treat this case as involving only Mercedes–Benz of North America, Inc., the distributor of the vehicle.

2. The breach of warranty claim, apparently disposed of at the summary judgment stage, is not at issue in this appeal.

proaching her front door, she decided to check her mail and retraced her steps to the mailbox located near the street. As she was retrieving the mail, the 560 SEL—which had rolled from the parking area—struck her, knocked her down, and ran over her right ankle, causing serious injury.

In July 1994, Bogosian sued the distributor[3] of the automobile (but not the manufacturer) to recover damages for her injuries. Underlying her tort claims were two design defect theories: (1) the absence of a "park ignition interlock," which would have prevented her from removing the ignition key if the vehicle was not in park gear, and (2) the existence of a "false park detent": a tactile phenomenon whereby the operator senses that the park gear is selected but, in fact, the gear selector lever is not fully engaged in park.

## II.

### Judgment As a Matter of Law

■ Bogosian challenges the district court's grant of Mercedes–Benz's motion, pursuant to Fed.R.Civ.P. 50(a), for judgment as a matter of law on her negligence claim. The court granted the motion at the close of Bogosian's case in chief upon finding that she failed to produce evidence to establish an automobile distributor's standard of care. We review the grant of a Rule 50(a) motion *de novo*, considering the evidence and reasonable inferences therefrom in the light most favorable to the non-movant. *Andrade v. Jamestown Hous. Auth.*, 82 F.3d 1179, 1186 (1st Cir.1996). The court may grant the motion only if the evidence, so viewed, would

not permit a reasonable jury to find for the plaintiff on her claim. *Id.*

■ Under Rhode Island law, "[i]n order to sustain a cause of action for negligence the plaintiff is required to establish a standard of care as well as a deviation from that standard." *Marshall v. Tomaselli*, 118 R.I. 190, 372 A.2d 1280, 1283 (1977). Thus, we review the record to determine if Bogosian introduced evidence sufficient to permit a reasonable jury to conclude that Mercedes–Benz deviated from some pertinent standard of care.

At trial, there was evidence that (1) the automobile industry first began to use park ignition interlocks[4] more than ten years before the 1986 sale of the 560 SEL, (2) by 1986, all vehicles sold in the United States having a gear shift *on the steering column* were equipped with the park interlock device, and (3) by 1986, 40% of vehicles that had a gear shift on the console (as did the 560 SEL) were equipped with the device. There was also testimony that installation of the park ignition interlock would result in a cost to the consumer of five to seven dollars. Bogosian contends, as she did below, that from this evidence the jury could have found that, in 1986, a distributor of a 560 SEL knew or should have known that the safety of the vehicle depended upon a park ignition interlock, and thus, a reasonably prudent distributor would have installed the inexpensive park ignition interlock mechanism.[5]

■ Bogosian was required to produce evidence that the distributor of the 560 SEL deviated from a standard of care when it failed to install the park ignition interlock

---

**3.** The parties describe Mercedes–Benz as both the "distributor" and "seller" of the 560 SEL in question. For simplicity, we refer to Mercedes–Benz as the "distributor" only.

**4.** The park ignition interlock acts to prevent a driver from removing the ignition key if the gear selector is in any position other than park.

**5.** Our review of the transcript of the arguments on the Rule 50(a) motion reveals that Bogosian did *not* advance a "failure to warn" theory of negligence. We note first that there was no evidence introduced tending to establish what would have been an adequate warning, on the part of a distributor, with regard to the absence

of a park ignition interlock. Moreover, having failed to raise before the district court any issue with regard to this possible theory, Bogosian has failed to preserve it for appeal. *See Wainwright Bank & Trust Co. v. Boulos*, 89 F.3d 17, 23 n. 2 (1st Cir.1996). Finally, other than quote the text of the Restatement of Torts (Second) § 401, Bogosian on appeal does nothing to hint at any developed argumentation on a failure to warn theory. *Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 734 (1st Cir.1990) (explaining that appellate arguments adverted to perfunctorily are deemed abandoned). Thus, we will not consider Bogosian's arguments with respect to her negligence claim under a failure to warn theory.

mechanism on her automobile. *See Scittarelli v. Providence Gas Co.,* 415 A.2d 1040, 1043 (R.I.1980) (requiring plaintiff, under negligent inspection and test claim against a distributor, to "establish a standard of care with respect to inspection and testing and the defendant's deviation from that standard"). She presented no evidence—either through customary distributor practices, past practices, or expert testimony—to establish a standard of care by which Mercedes–Benz, as distributor, should have operated. Having utterly failed to establish that Mercedes–Benz acted below a minimum standard of care when it failed to install the park ignition interlock, Bogosian could not have prevailed on her negligence claim. Thus, the district court did not err in granting judgment as a matter of law in favor of Mercedes–Benz on this claim.[6]

## III.

### Expert Testimony on "False Park Detent" Theory

Bogosian contends that the district court erroneously excluded the proposed expert testimony of Joseph Davidson on the false park detent theory. After conducting an extensive voir dire, the court ruled that Davidson's testimony was inadmissible for three reasons: (1) it was not within Davidson's expertise to opine on the issue of transmission design; (2) his methodology in examining the 560 SEL to determine the cause of Bogosian's injury was unreliable; and (3) the factual foundation for his testimony was inadequate because Bogosian was unable to establish that the vehicle was in substantially the same condition at the time Davidson tested it as it was when the accident occurred.

### A. Rule 702 Requirements and Standard of Review

■ When faced with a proffer of expert testimony, the district court must determine whether the expert witness is qualified and has specialized knowledge that will "assist the trier of fact to understand the evidence

or to determine a fact in issue." Fed.R.Evid. 702; *see generally United States v. Sepulveda,* 15 F.3d 1161, 1183 (1st Cir.1993) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 2795, 125 L.Ed.2d 469 (1993)), *cert. denied,* 512 U.S. 1223, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994). First, the court has broad discretionary powers in determining whether or not the proposed expert is qualified by "knowledge, skill, experience, training, or education." Fed.R.Evid. 702; *see generally Richmond Steel, Inc. v. Puerto Rican Am. Ins. Co.,* 954 F.2d 19, 21 (1st Cir.1992). Next, the court decides if the proposed subject matter of the expert opinion properly concerns "scientific, technical, or other specialized knowledge." Fed.R.Evid. 702. Finally, the court performs a gatekeeping function to ascertain whether the testimony is helpful to the trier of fact, *i.e.,* whether it rests on a reliable foundation and is relevant to the facts of the case. *See Vadala v. Teledyne Indus., Inc.,* 44 F.3d 36, 39 (1st Cir.1995); *see also Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795 (characterizing this consideration as one of "fit.").

■ "Because gauging an expert witness's usefulness is almost always a case-specific inquiry, the law affords trial judges substantial discretion in connection with the admission or exclusion of opinion evidence." *Sepulveda,* 15 F.3d at 1183. Thus, we will uphold the district court's ruling in this area unless it is "manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). With the foregoing precepts in mind, we turn to the facts of this case.

### B. Qualifications

The record establishes that Davidson earned a Bachelor of Science degree in industrial and vocational education, and had been certified to teach vocational automobile mechanics. At the time of trial, he was certified by the National Institute for Automotive Service Excellence as a master auto-

---

6. *See Tokio Marine & Fire Ins., Co. v. Grove Mfg. Co.,* 958 F.2d 1169, 1172 (1st Cir.1992) (upholding directed verdict on negligence claim where plaintiff failed to present evidence of standard of care).

mobile technician for diagnosis and repair of various vehicles, including passenger cars. He worked as an automobile mechanic from 1952 to 1967. Shortly thereafter, he became a "consultant in forensic automotive mechanics," now his full time employment.[7]

Davidson does not have an engineering degree, and his formal education in engineering was apparently limited to three semesters of "basic" electrical engineering courses at Carnegie–Mellon University before he dropped out. He explained that his hands-on experience made him familiar with automatic transmissions. He conceded that he had never professionally designed a component for an automobile, although he had done so "in the courtroom." He also conceded that he had never designed a transmission or a gear shift selector, and had no formal training in manufacturing automobiles or their components. He saw neither design drawings nor specifications of the 560 SEL, although he had reviewed service literature and "cutaway" drawings for the automobile. Of the 126 prior times that he had testified as an expert, only one of them involved the false park detent phenomenon.

Because Davidson would have testified that the false park detent rendered the 560 SEL dangerous, and he would have offered a corrective modification, the district court found that he essentially would have opined on the central issue of design defect.[8] The court acknowledged that Davidson was "a very well qualified master mechanic," but ruled that his expertise did not extend to the design defect issue at hand. On appeal, Bogosian challenges this ruling, which we review for clear error. *See Richmond Steel, Inc.*, 954 F.2d at 21; *DaSilva v. American*

Brands, Inc., 845 F.2d 356, 361 (1st Cir. 1988).

■ The record establishes that, at most, Davidson had extensive experience in automotive repair. His background shows a lack of any significant expertise—by way of knowledge, skill, experience, training, or education—in relevant areas such as the design or manufacture of automobiles or their components. *See Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 958 F.2d 1169, 1175 (1st Cir.1992) (upholding exclusion of proposed expert in design defect case where, *inter alia*, witness lacked familiarity in product's design, manufacture, marketing and applicable industry standards). While not dispositive, the lack of a mechanical engineering degree or other engineering expertise certainly calls into question Davidson's ability to criticize the design of a transmission parking mechanism and its operation under various circumstances.[9] On this background, we find no clear error in the district court's finding that Davidson was not qualified to opine on the issue of a transmission design defect.

### C. Underlying Methodology

■ Davidson would have testified that he first identified the false park detent phenomenon in January 1979. He would have explained that a false park detent can occur when the gear selector lever is not placed completely in the park notch, which is set off to the left in the console shift, a position referred to as "latched park." *See* Appendix A. When the selector lever is in latched park, the vehicle will not roll any appreciable distance. A position just short of latched park, however, could produce a false park

---

7. When asked the meaning of the word "forensic" in this capacity, Davidson replied: "There are a number of meanings to the word 'forensic.' ... It has to do with applying scientific principles to a problem using scientific techniques and technology. Another is 'suitable for use in the courts.' Still another is to persuade by convincing arguments. So all those meanings come together in the kind of work I do."

8. Although Bogosian insisted that Davidson would not testify about design, but would only explain how the transmission worked, the record supports the court's finding that Davidson's conclusions embraced the subject of transmission

design and defect; in the absence of clear error, we will not disturb this finding.

9. *See, e.g., DaSilva*, 845 F.2d at 361 (finding mechanical engineer with twenty-three years of engineering experience and "extensive experience evaluating and recommending safety devices for machines" qualified to testify regarding safety design of industrial mixer); *Kallio v. Ford Motor Co.*, 391 N.W.2d 860, 861 (Ct.App.Minn. 1986) (describing testimony of various mechanical engineering experts in case where alleged transmission design defect created a "false park"), *aff'd*, 407 N.W.2d 92 (Minn.1987).

detent—a tactile sensation that the car is fully in park gear. In this situation, the car is susceptible to rolling.[10]

Davidson would have testified that this false park detent is felt when one shifts rapidly from drive towards park, but fails to fully engage in the latched park position. He stated that if one were to look closely at the console shift, one would be able to see if the selector lever was in a position, *e.g.*, between reverse and park, that would indicate the possibility of a false park detent. He explained that if the operator shifted slowly and carefully into park, he or she could not leave the selector lever in anything but latched park.[11] He also stated that if the operator sees that the gear selector lever is in the latched park position (*i.e.*, set off to the left), the false park detent phenomenon has no application.

With respect to his investigation of the facts of this case, Davidson stated that, in January 1994, he questioned Bogosian about the July 1992 events leading up to her injury. He examined the parking area of her home and measured the grade of the approximate location on which she had parked just before the 560 SEL rolled. He then travelled to an automobile garage, Fred's Autohaus, where the automobile was located. At the garage, Davidson tested and experimented with the action of the park lock in the vehicle's transmission mechanism.[12]

Based on his testing of the 560 SEL's transmission park mechanism, Davidson

would have testified that the vehicle was capable of a false park detent. He would have opined that this phenomenon rendered the vehicle defective and unreasonably dangerous, and he would have offered a corrective solution involving a part modification. While the record is unclear on this point,[13] Davidson presumably would have opined that, given Bogosian's insistence that she placed the gear selector lever in park before exiting the automobile, this defect, in combination with the slight slope of the parking area, led to her injury.

Citing *Daubert*, the district court expressed its concern with the reasoning and methodology underlying Davidson's opinion. The court stated:

Here the proffered evidence is that the vehicle was in a garage, the rear wheel was lifted and rotated, and the shift lever placed in a particular position with a result from which the witness apparently would extrapolate the conclusion that this is the way Plaintiff was injured. But there is no evidence that the so-called test that was used was anything that even remotely resembled a known technique. No proffer of any kind of scientific journal or paper, nothing of that sort to show that this is the way you find out that sort of thing.

The court further remarked that the "appropriate design of part of an automobile having to do with keeping it at rest after the car is stopped and the driver has left the driver's seat" was a "scientific" issue.

---

**10.** Davidson would have explained that, in a false park detent situation, the vehicle could roll because the park pawl in the transmission park mechanism was only "tip engaged" and the spring in the park linkage was not fully compressed. When the vehicle was in latched park, on the other hand, the park pawl would lock into the a park slot on the park gear, thereby preventing the car from rolling.

**11.** Because the gear selector lever is spring-loaded to the left, once the lever is sufficiently pushed forward towards the park position, it pulls to the left into the latched park position.

**12.** Specifically, he first tested the transmission gear shifter to confirm that it was in good adjustment, then placed the selector lever in park. He lifted the right rear wheel off the ground, and turned it until the park pawl in the transmission locked into the park slot, *i.e.*, until the car was fully locked into park gear and the wheel would

no longer turn. At that point, he moved the gear selector lever out of park and turned the right rear wheel further so that when he shifted back into park, the park pawl would hit the tip of the tooth on the park gear rather than drop straight into the park slot. Thus, in order for the car to shift fully into latched park, the spring in the park pawl linkage inside the transmission would have to be compressed.

**13.** The record before us does not contain a copy of Davidson's curriculum vitae, his report, supporting documents or exhibits, or any other aspects of his proffer other than the transcript of the court proceedings. To the extent that the absence of any of these items creates any material doubt, that doubt is resolved against the appellant, Bogosian. *See LaRou v. Ridlon*, 98 F.3d 659, 663 (1st Cir.1996).

Bogosian contends that the court committed reversible error because it wrongly characterized the subject of Davidson's testimony as "scientific" rather than "technical," and thus, *Daubert* was inapplicable. Assuming *arguendo* that this case does not involve "scientific law" (and thus, *Daubert*'s holding does not apply), we must then consider "*Daubert*'s countervailing precept: that the trial judge is assigned 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Vadala*, 44 F.3d at 39 (quoting *Daubert*, 509 U.S. at 597, 113 S.Ct. at 2798). Thus, even if *Daubert*'s specific discussion of the admissibility of scientific principles did not strictly apply to Davidson's testimony, the admissibility of the testimony was still controlled by the requirement of factual relevance and foundational reliability. *See* 509 U.S. at 591–92, 113 S.Ct. at 2795–96.

Here, the district court was troubled by Davidson's procedures in investigating the applicability of his false park detent theory to this case. Davidson examined the vehicle away from the site of the accident. He did not, in any way, attempt to replicate the known facts surrounding the injury-producing event, but rather, tested his theory by raising a rear wheel of the vehicle as it sat in Fred's Autohaus. On the record before us, it appears that Davidson did little more than come to the unremarkable conclusion that the vehicle's wheels would not turn when the gear selector lever was in latched park, but that they would turn when the lever was in any other position. *See supra* notes 12 & 13.

Moreover, Davidson's conclusion that a false park detent caused the injury-producing events assumed that Bogosian shifted the selector lever rapidly from drive towards park, and that she left the lever in a position short of latched park. First, there was no evidence as to the speed with which Bogosian shifted the selector lever. More importantly, Bogosian repeatedly testified that she looked at the console shift before exiting the vehicle and saw the selector lever in latched park. She steadfastly maintained this position, even after prompting from a generously worded question by her counsel on redirect examination. While, of course, the jury could have disregarded plaintiff's own testimony, it does little to tie the facts of this case to Davidson's proffered opinion, especially given his concession that there could be no false park detent if the vehicle operator observed the selector lever in latched park. The district court appropriately found it very odd that Bogosian would present an expert witness who would testify that her own unwavering testimony was incorrect.

In the end, the district court clearly was not persuaded that Davidson's opinion rested upon a reliable factual and methodological foundation. While the district court may have inartfully cited *Daubert* in making its ruling, we cannot say that it abused its substantial discretion when finding inadequate the premises of the proposed testimony.

### D.  Substantially Same Condition

The district court's final concern with the proposed expert testimony was the lack of evidence to validate the condition of the 560 SEL at the time of Davidson's examination. Davidson tested the transmission parking mechanism on the automobile in January 1994, approximately one and a half years after the accident. Before Davidson's inspection, a "series of engineers" examined the vehicle on behalf of both Bogosian and Mercedes–Benz. At some point, the vehicle was transported to Fred's Autohaus, where it was placed on a lift; at yet some other unspecified time, the vehicle was sold to a third party. The court indicated that, given these events, Bogosian would have to present evidence sufficient to establish that the transmission mechanism was in substantially the same condition at the time of Davidson's tests as it was at the time of the accident.

In response to the court's concerns, Bogosian offered the testimony of her daughter, Evan Perri (the owner of the 560 SEL), who would have testified as to the physical whereabouts of the automobile during the time in question. Perri had no knowledge, however, about the tests or examinations performed during the various inspections. The court concluded that without the testimony of those who inspected the transmission before Davidson, Bogosian could not establish that David-

son's conclusions rested upon a reliable factual foundation.

▬▬▬ Where, as here, a conclusion that a product was defective derives from a test or examination of it, there must be sufficient evidence to support a finding that the product was in substantially the same condition—in relevant respects—when tested as it was at the time of the accident. The absence of such a showing renders irrelevant any testimony based on the test or examination. *See Kukuruza v. General Elec. Co.,* 510 F.2d 1208, 1211–12 (1st Cir.1975) (requiring a prima facie showing of substantial identity of the product's condition at the time of the accident and the time of inspection); *cf. Fusco v. General Motors Corp.,* 11 F.3d 259, 263–64 (1st Cir.1993) (requiring a foundational showing of substantial similarity in circumstances between proffered demonstration and actual events).

Given that a number of experts examined and tested the 560 SEL in an attempt to determine why it unexpectedly rolled, the district court was warranted in requiring Bogosian to come forward with evidence sufficient to prove that those experts did not disturb the transmission mechanism in any material respect. *See Williams v. Briggs Co.,* 62 F.3d 703, 707–08 (5th Cir.1995) (upholding exclusion of testimony about water heater malfunction where the expert conducted a test two years after the accident and after various, unspecified repairs were made); *see also Romano v. Ann & Hope Factory Outlet, Inc.,* 417 A.2d 1375, 1379–80 (R.I.1980) (upholding, under Rhode Island evidence laws, trial court's discretionary exclusion of design-defect testimony where the expert examined the bicycle two years after the accident and after a previous expert's experiments) (collecting cases).

Because neither Davidson nor Perri was competent to establish the requisite similarity of condition, there was no evidentiary link between the condition of the transmission in July 1992 and in January 1994.[14] On these facts, Bogosian failed to make a prima facie showing that the condition of the transmission at the time of Davidson's testing was substantially similar to that on the accident date. Thus, we conclude that the court properly excluded Davidson's expert opinion, in part, on this basis. *See* Fed.R.Evid. 104(b) & advisory committee's note (concerning conditionally relevant evidence); *United States v. Wilson,* 798 F.2d 509, 515–16 (1st Cir.1986) (explaining that a district court enjoys broad discretion in determining the admissibility of conditionally relevant material).[15]

In conclusion, we have considered carefully Bogosian's arguments and the record before us, and, for all of the foregoing reasons, we do not find the district court's decision to exclude Davidson's testimony to be manifestly erroneous.

## IV.

### Subsequent Remedial Measures

Bogosian claims error in the district court's refusal to allow her to question Mercedes–Benz's expert witness regarding the installation of park ignition interlocks on Mercedes–Benz vehicles apparently beginning with the 1990 model year. The installation of this interlock device occurred after the 1986 sale of the 560 SEL at issue here, but before Bogosian's accident in 1992. Bogosian argues that evidence of the modification was admissible because (1) Mercedes–Benz contested its feasibility, and, (2) in any event, Federal Rule of Evidence 407, which prohibits evidence of subsequent remedial measures under certain circumstances, is inapplicable on the facts of this case.

Before trial, Mercedes–Benz stipulated to the feasibility of installing the park ignition

---

14. Although Davidson viewed service literature and "cutaway" drawings for the 560 SEL, he made no representations as to the relevance or accuracy of these documents with respect to the vehicle's transmission at either the time of the accident, or his examination, or both. More importantly, Davidson's January 1994 tests, not these documents, formed the basis of his testimony.

15. *See also Vadala,* 44 F.3d at 39 (finding witness's expertise irrelevant where the opinion lacked substantial factual basis); *United States v. Sorrentino,* 726 F.2d 876, 885 (1st Cir.1984) (same).

interlock in 1986, and moved in limine for the exclusion of evidence regarding its use beginning 1990. During trial, Bogosian was allowed to introduce evidence regarding the feasibility of a park ignition interlock mechanism on a vehicle such as the 1986 560 SEL, to wit: its low cost and simple installation procedure. This evidence was uncontroverted. Subsequently, on cross-examination of Mercedes–Benz's only witness, Axel Stehle—the manager of product analysis at Mercedes–Benz—Bogosian asked if it was feasible in 1986 for Mercedes–Benz to equip the 560 SEL with the mechanism. Stehle, who had not testified about the subject on direct examination, answered, "Not to my knowledge." [16] At this, Bogosian sought to question Stehle about the subsequent modification. The court refused to allow the questioning, characterizing it as "bootstrapping."

■ Although this circuit has recognized that Federal Rule of Evidence 407 applies to strict liability cases, see *Raymond v. Raymond Corp.*, 938 F.2d 1518, 1523 (1st Cir. 1991), it does not apply where, as here, the modification took place before the accident that precipitated the suit. *Id.* In cases such as this, the district court may, if necessary, exclude evidence of the remedial modification by resort to its considerable discretion under Rule 403, which permits the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or misleading the jury. *See* Fed.R.Evid. 403; *Raymond*, 938 F.2d at 1523–24.

■ A strict liability claim centers on the condition of the product " 'at the time it leaves the seller's hands.' " *Ritter v. Narragansett Elec. Co.*, 109 R.I. 176, 283 A.2d 255, 262 (1971) (quoting Restatement (Second) of Torts § 402A cmt. g). For this reason,

the introduction of evidence of pre-accident design modifications not made effective until after the manufacture of the allegedly defective product may reasonably be found unfairly prejudicial to the defendant and misleading to the jury for determining the question whether the product was unreasonably dangerous at the time of manufacture and sale.

*Raymond*, 938 F.2d at 1524. Thus, the district court may supportably exclude evidence of post-manufacture, pre-accident design modifications if its probative value is substantially outweighed by its prejudicial effects. *Id.*

■ Here, Mercedes–Benz stipulated pretrial that the park ignition interlock was a feasible modification in 1986. Accordingly, it did not controvert Bogosian's evidence regarding the ease with which Mercedes–Benz could have installed the mechanism, nor did it present testimony that the mechanism would have been impractical or impossible. Thus, the jury had before it uncontroverted evidence that Mercedes–Benz could have implemented the modification during the relevant time frame; any evidence that Mercedes–Benz, in fact, later modified its vehicles risked the danger that "jurors would too readily equate subsequent design modifications with admissions of a prior defective design." *Id.* at 1523. Given this, the court appropriately prohibited Bogosian from exploring the topic on cross-examination of Stehle, and further recognized that Bogosian was attempting to create a feasibility dispute where there was none.[17] Finally, having failed to offer the stipulation to be read to the jury, Bogosian cannot now complain that such a reading would have been ineffective. We find that the district

16. Although Stehle explained on direct that Mercedes–Benz chose to utilize a *steering* ignition interlock—which prevented normal steerability when the key was removed from the ignition—in order to comply with a federal standard, Stehle never opined on the issue of whether or not Mercedes–Benz was capable of installing the park ignition interlock in 1986.

17. *See Albrecht v. Baltimore & Ohio R.R. Co.*, 808 F.2d 329, 331 (4th Cir.1987) ("It is not for the plaintiff to put feasibility in issue, for feasibility is

not in issue unless and until controverted by the defendant."); *Gauthier v. AMF, Inc.*, 788 F.2d 634 (9th Cir.1986) (explaining that, where defendant neither introduces evidence of infeasibility nor argues it, plaintiff may then "introduce evidence of feasibility other than subsequent remedial measures and could argue that defendant had not disputed the point." (quotation and citation omitted)), *amended by*, 805 F.2d 337 (9th Cir.1986).

court did not abuse its considerable discretion in its treatment of this matter.

## V.

### Motion for New Trial

Bogosian argues that the district court erred in denying her motion for new trial. *See* Fed.R.Civ.P. 59. Bogosian contends that the evidence established that Mercedes–Benz knew or should have known that vehicle safety depended on the installation of a park ignition interlock, and that the lack of the interlock rendered the 560 SEL unreasonably dangerous and caused Bogosian's injury. Bogosian further asserts that, because the 560 SEL rolled, the gear selector lever must have only *appeared* to have been in the latched park position. Thus, she argues, "[t]he obvious inference to be drawn is that, in the absence of the car having been pushed by little green men, the car rolled because it was *not fully engaged* in the [latched park] position."

■■■■■ We review for abuse of discretion the denial of a Rule 59 motion for new trial. *Fernandez v. Corporacion Insular De Seguros,* 79 F.3d 207 (1st Cir.1996). A new trial is warranted "only if the verdict, though rationally based on the evidence, 'was so clearly against the weight of the evidence as to amount to a manifest miscarriage of justice.'" *Id.* (quoting *Lama v. Borras,* 16 F.3d 473, 477 (1st Cir.1994)).

■■■ The district court instructed the jury that, to prevail on her strict product liability claim, Bogosian had to establish that the 560 SEL was in a defective condition unreasonably dangerous to the consumer, and that the defect caused her injury. *See Ritter,* 283 A.2d at 261 (citing Restatement (Second) of Torts § 402A for elements of strict product liability claim). There was evidence that the gear selector lever of the 560 SEL was in good working condition, and, when placed in full latched park, the vehicle would not roll.

Thus, despite Bogosian's adamant testimony to the contrary, the jury could infer from the fact that the vehicle rolled that it was not in latched park just prior to her injury. The jury could also infer that a park ignition interlock would have prevented Bogosian from removing the ignition key, as she did, before she exited the vehicle.

■■■ For Bogosian to prevail on her claim, however, the jury had to find that the absence of a park ignition interlock constituted an *unreasonably dangerous* defect. A defect renders a product "unreasonably dangerous" if it "establishes a strong likelihood of injury to the ... consumer ... who is unaware of the danger involved in the use of a product in a way it was intended to be used or in using the product in a normal manner." *Ritter,* 283 A.2d at 263. Accordingly, the district court instructed the jury that a seller of a product does not have a "duty to provide an accident proof, perfect or foolproof product." The evidence established that only 40% of motor vehicles sold in the United States in 1986 with a console shift were equipped with a park interlock system. Moreover, there was conflicting evidence regarding whether, in 1986, the interlock mechanism was a safety or an anti-theft device. There was also evidence that the parking brake was in good order, and that, if Bogosian had used it as directed in the owner's manual, the vehicle would not have rolled regardless of the position of the gear selector lever. On this evidence, the jury was not compelled to find for Bogosian on her strict product liability theory. We find that the district court did not abuse its discretion in denying the new trial motion.

## VI.

### Conclusion

For the foregoing reasons, we *affirm* the judgment of the district court in all respects. *Costs to appellees.*

APPENDIX A

"D" Drive.
Automatic upshifting to top gear. Position "D" affords optimum driving characteristics under all normal operating conditions.

"3" Upshift to 3rd gear only. Suitable for medium range up or down-grades.

"2" Upshift to 2nd gear only. For driving in mountainous regions. Since transmission will not shift up further, this gear selection will make use of the engine's braking power.

"B" In this position, the engine's braking effect is utilized while descending steep or lengthy downgrades, especially with a trailer. Use this position only below 60 km/h (40 mph).

"P" Parking lock.
The parking lock is an additional safeguard to the parking brake when parking the vehicle. Engage only with the car stopped.

"R" Reverse gear.
Shift to reverse gear only with the car stopped.

"N" Neutral.
No power is transmitted from the engine to the rear axle. When the brakes are released, the vehicle can be moved freely (pushed, towed or tow-started). Do not engage "N" when driving except when the vehicle is in danger of skidding (e.g. on icy roads, see page 17).

Selector Lever Positions

The automatic gear shifting process can be adapted to specific operating conditions using the selector lever.